**UNITED STATES of America**

**v.**

**Elias CARRASQUILLO.**

**Crim. No. 87–271.**

United States District Court, District of Columbia.

Sept. 23, 1987.

Robert G. Andary, Asst. U.S. Atty., Washington, D.C., for the Government.

Steven R. Kiersh and Karen L. Hochstein of Kiersh and Buckman, Washington, D.C., for defendant.

CHARLES R. RICHEY, District Judge.

On September 1, 1987, this Court held a hearing on Defendant's Motion to Suppress Tangible Evidence and Motion to Suppress Statements in connection with a charge that defendant had violated 21 U.S.C. § 841(a)(1). On May 29, 1987, defendant was arrested for unlawfully, knowingly, and intentionally possessing with the intent to distribute in excess of 500 grams of cocaine. In fact, the defendant was found

to have approximately 4 kilos of cocaine in his possession.

The defendant was arrested at Union Station in Washington, D.C. while en route from Orlando, Florida to Philadelphia, Pennsylvania via Amtrak after a narcotics-sniffing dog, Max–25, alerted law enforcement officials to the presence of drugs in a suitcase found under the defendant's train seat.

The defendant first attracted the interest of Amtrak Investigator Ford, a 16–year law enforcement veteran, who was assigned to monitor computer reservations made from so-called "cocaine source cities," primarily located in Florida, for travel to the northeast part of the country. He noted that one particular passenger had made a quick reservation for a one-way ticket in a roomette from Orlando to Philadelphia and that the reserved name was changed soon after booking. When this passenger arrived at the ticket window approximately 20 minutes prior to departure, he paid cash for a coach seat and cancelled the roomette. This information was noted by the ticket agent and relayed to Agent Ford. Collectively, this information aroused Agent Ford's suspicions that this passenger might be engaged in drug trafficking. Drug courier profiles have been approved by the Supreme Court. *See United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

Based on these suspicions, Agent Ford contacted Amtrak Investigator Moss in Richmond who boarded the train at this point to observe the defendant. When the train arrived in Washington, Agent Ford and a DEA agent boarded the train car in which the defendant was seated. They approached the defendant and identified themselves as police officers, whereupon

they asked to see his ticket and identification. "Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual [in a public place], by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983).

■ In response to an inquiry from Agent Ford, the defendant produced his ticket and several pieces of identification.[1] The name on the ticket varied from that on his library card and driver's license. When asked where he was going, the defendant said New York, but his ticket read Philadelphia. The agents then inquired about the luggage under his seat. He disclaimed ownership. When the agents asked him if they could look inside, he reiterated that he did not own the bag, that he knew "nothing about the bag," and that they could "look in the bag." Without objection, the agents removed the bag to the platform, and the defendant voluntarily accompanied the agents.[2] Reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop, in this case to verify or dispel a suspicion of drug trafficking. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); *see also Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ On the platform, Max–25 sniffed the luggage and indicated to the agents that narcotics were inside. The use of trained dogs to detect the presence of controlled substances in luggage has been held to be a feasible and expeditious way to detain a suspect for the shortest period of time in

---

**1.** At the hearing, Agent Ford testified that he promptly returned the ticket and identification to the defendant. The defendant claimed that Agent Ford kept his ticket and identification. Upon examination by the Court as to the defendant's activities in Florida and his travel plans, the Court concludes that the defendant lacked credibility.

**2.** Agent Ford testified that the defendant was asked if he would voluntarily accompany him onto the platform and that the defendant agreed. Defendant claimed that one of the agents seized his arm and that he was made to march off the train between the two agents. For the reasons explained in n. 1, *supra,* the Court rejects the defendant's version of events.

which to confirm or dispel suspicions. *Florida v. Royer*, 460 U.S. 491, 505–506, 103 S.Ct. 1319, 1328–29, 75 L.Ed.2d 229 (1983); *see also United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed. 2d 110 (1983) (Limited disclosure as a result of a "canine sniff" avoids embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.). When the dog alerted the agents to the presence of a controlled substance, probable cause existed to justify arrest and search of the bag. As the Supreme Court has held, "(a) negative result would have freed [the defendant] in short order; a positive result would have resulted in his justifiable arrest on probable cause." *Id.* 460 U.S. at 506, 103 S.Ct. at 1329. Therefore, defendant's motion to suppress is denied.

■ As an alternative theory in support of its actions, the Government contends that, because of the defendant's affirmations on the train, on the platform at Union Station, and under oath at the hearing held before this Court on September 1, 1987 that he did not own the luggage, then he could have no reasonable expectation of privacy and therefore lacks standing to complain of the warrantless search of the suitcase. *See, e.g., Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960) (As far as petitioner was concerned, articles thrown away were *bona vacantia*.). Although *Abel* involved trash, lower courts have applied the same rationale to disclaimers regarding ownership of luggage. *See, e.g., United States v. Anderson*, 500 F.2d 1311, 1318, *reh'g denied*, 504 F.2d 760 (5th Cir.1974) (Defendants had no standing to complain that luggage which they declined to claim was searched without a warrant.). In this case, the defendant repeatedly disavowed ownership of the luggage. *See United States v. Jones*, 707 F.2d 1169, 1172–73 (10th Cir.), *cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983) (Repeated disavowals of any knowledge of the satchel indicate a clear intent to relinquish an expectation of privacy and abandon the satchel.). There was no action by law enforcement agents that could in any way be interpreted as "tainting" the defendant's oral denial of an interest in the luggage. *See United States v. Jackson*, 544 F.2d 407, 410 (9th Cir.1976). Thus, the Court concludes that the defendant had no reasonable expectation of privacy in the luggage when he repeatedly told the law enforcement agents that the luggage was not his.

Defendant's Motion to Suppress Statements involves three utterances. Two of them, "I know nothing about the bag" and "You can look in the bag," preceded defendant's arrest. These were voluntary answers to questions from the agents and can be offered in evidence in a criminal prosecution. *See Royer*, 460 U.S. at 497, 103 S.Ct. at 1323 (citations omitted). Therefore, defendant's motion to suppress these two statements is denied.

■ The third statement, "The cross in the bag is mine," was made after the defendant was arrested and advised of his rights, and after he said that he would not answer any questions without his attorney. The Court finds that the question from the law enforcement officer that prompted this reply may well have involved the kind of "coercive police activity," *i.e.,* a deception aimed at positively linking defendant to ownership of the luggage, that Chief Justice Rehnquist decried in *Colorado v. Connelly*, — U.S. —, 107 S.Ct. 515, 522, 523–24, 93 L.Ed.2d 473 (1986), quoting *Fare v. Michael C.,* 442 U.S. 707, 726–27, 99 S.Ct. 2560, 2572–73, 61 L.Ed.2d 197 (1979). Therefore, defendant's motion to suppress this statement is granted. This memorandum opinion shall constitute the Court's reasoning in support of its Order filed September 1, 1987.